IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

UNITED STATES OF AMERICA    )
    )    **Criminal No. 4:20-cr-00019**
**v.**    )
    )    **By:    Michael F. Urbanski**
**RASHAN FRANKLIN,**    )    **Chief United States District Judge**
    **Defendant.**    )

## MEMORANDUM OPINION

This matter is before the court on Rashan Franklin's motion to suppress all testimonial and physical evidence. ECF No. 29. The government opposes Franklin's motion, ECF No. 31, and Franklin has filed a reply, ECF No. 35. For the reasons explained herein, the court will **DENY IN PART** Franklin's motion to suppress the gun, all statements about his identity regardless of when they were made, and any statements he made prior to being handcuffed. The court will **GRANT IN PART** the motion as to all statements Franklin made after he was handcuffed which did not pertain to his identity. The court will **DENY AS MOOT** the motion as to any physical or testimonial evidence regarding the suitcase and the drugs found therein, as the government does not intend to introduce that evidence at trial.

## I.

On November 26, 2019, Danville police received a 9-1-1 call from a woman reporting a possible break-in at the apartment next to hers, Apartment Four. 9-1-1 Audio Recording Tr., ECF No. 34-2, at 1. The woman said the reason for her call was "not really an emergency," but two "guys" had tried to open her apartment door multiple times and then "busted" into the neighboring apartment, which had been empty for months and had

notices posted on its door for failure to pay rent. Id. at 1–2. She said the two men were wearing gray hoodies and carrying black trash bags from a nearby car into Apartment Four. Id. at 2. The neighbor spoke quietly throughout the call to avoid being overheard, saying "[i]t started scaring me when they were trying our doorknob." Id. She could hear them talking loudly and "joking around." Id. at 3. Though she couldn't understand most of what they said, she thought she overhead them talking about parties, the police, and killing "quote unquote n[****]rs." Id. at 4–5. During the call, the neighbor does not identify the two individuals as Black or any other race, though the Danville police report says that she reported seeing "two black males carrying trash bags into the apartment…wearing gray sweat pants." Compare id. at 1–6 with Danville Police Report, ECF No. 34, at 4.

In response, Officers J.S. Stadler, K.C. Nau, and G.A. Clay, were dispatched to the scene. See Danville Police Report. It was dark outside when they arrived. See generally Stadler Body Worn Camera ("BWC") Video, ECF No. 34-3. All three officers surveyed the area, and Stadler attempted to listen in through the front door of Apartment Four. One officer noted the two people might just be moving in as the door was not damaged, but it did not "sound to[o] good," as the two men sounded either drunk or high. Id. at 2:07–6:43; Stadler BWC Video Tr., ECF No. 34-4, at 1–2. In his report, Nau says the two men were just talking to each other and "did not look like they were attempting to steal items from inside the apartment." Danville Police Report at 8. Stadler and Nau then knocked on the front door, which Anthony Julius Clodfelter answered while Franklin remained seated in a chair. Id. at 7. Meanwhile, Clay tried to peer into the apartment through a window on the other side of the building and reportedly saw a Black man in a white sweatshirt—later

2

identified as Franklin—hurry over to the cabinet after hearing the officers' voices and place a black item inside it. Id. at 7.

After Clodfelter answered the door, Stadler asked if he lived in the apartment and Clodfelter indicated he had lived there for some time. Stadler BWC Video, ECF No. 34-3, at 7:00–10; Stadler BWC Video Tr., ECF No. 34-4, at 2–3. When Stadler asked if they could come inside and explain why they were there, Clodfelter said yes and quickly turned around to lead them in. Stadler BWC Video at 7:10–16; Stadler BWC Video Tr. at 2.

Clodfelter told the officers he was there with his "home-boy." Stadler BWC Video at 7:16–19; Stadler BWC Video Tr. at 2. Later in the encounter, Clodfelter says he met Franklin for the first time that day at a nearby Speedway where he was "stacking" shelves. Stadler BWC Video at 16:12–26; Stadler BWC Video Tr. at 14; Danville Police Report, ECF No. 34, at 15. Clodfelter said he did not know Franklin's name or that he was selling drugs, but he swore he needed a home, so Clodfelter brought him back to his apartment so he could stay there. Clay BWC Video, ECF No. 34-5, at 7:20–43; Stadler BWC Video at 26:55–27:43; Stadler BWC Video Tr. at 25; Danville Police Report at 8, 15.[1]

The apartment was a small, dimly lit studio with only a few furnishings. Danville Police Report at 9; see generally Stadler BWC Video; Clay BWC Video. Franklin was standing by the kitchen cabinets and Clodfelter, who seemed relaxed, stood in the center of the room. Stadler BWC Video at 7:19–30. Stadler stood in the center of the room while Nau

---

[1] Nau believes Clodfelter "has involvement with Franklin." Danville Police Report, ECF No. 34, at 9. The day after the arrest, Clodfelter was pulled over by law enforcement while driving Franklin's vehicle, which he was moving to his sister's house "because he did not know what was going on with Franklin." Id. at 15. Investigator C.K. Newcomb confronted Clodfelter about suspicions that he knew Franklin prior to the arrest, but Clodfelter "became defensive" and maintained that it was the first time they had met, saying he "knew it was stupid to allow someone he just met, to move into his apartment." Id. at 16.

stood in front of the hallway, blocking the path to the exit. See generally id. Stadler told Clodfelter they were responding to a reported break-in. Id. at 7:32–40; Stadler BWC Video Tr., ECF No. 34-4, at 3. Clodfelter jerked his head back in surprise and quickly handed his driver's license to Nau to show he lived there. Stadler BWC Video, ECF No. 34-3, at 7:38– 8:11. Nau looked at it briefly, provided the driver's license number to dispatch, and then handed it back to Clodfelter. Id. The officers later learned that Clodfelter had been there for three years but mostly stayed with "his girl." Id. at 9:16–35. The officers stated that they had been watching the men through the window and had not seen them "doing anything weird." Id. at 8:14–18; Stadler BWC Video Tr. at 4. They noted that the men were having a casual conversation whereas someone who was breaking into an apartment would try "to be sneaky." Stadler BWC Video at 8:18–23; Stadler BWC Video Tr. at 4. At that time, Clay entered the apartment.

Nau then asked Franklin for his name and identification. Stadler BWC Video at 8:31; Stadler BWC Video Tr. at 4. At first, Franklin claimed his name was "Semaj Ramadan Reaves" and gave a false social security number in lieu of a driver's license, which Stadler relayed to dispatch. Stadler BWC Video at 8:35–45. Nau then told the two men that once they identified them both, they would "get out of [their] hair." Id. at 9:05–08; Stadler BWC Video Tr. at 5. The officers asked whether they were smoking weed, though they said they were uninterested in hassling them about that. Stadler BWC Video at 9:37–56; Stadler BWC Video Tr. at 5.

Clay then started asking Franklin what he put in the cabinet. Id. at 9:56–59; Stadler BWC Video Tr. at 6. Franklin said he put coffee in there. Stadler BWC Video at 9:59–10:02;

4

Stadler BWC Video Tr., ECF No. 34-4, at 6. Dispatch then reported there was no record of the name nor the social security number Franklin provided. Stadler BWC Video, ECF No. 34-3, at 10:17–20. Stadler again asked Franklin for his social security number and noted that he "didn't sound very sure of" himself. Clay BWC Video, ECF No. 34-5, at 00:55–57; Stadler BWC Video Tr. at 7. Clay told Franklin that he thought he was lying about his social security number and again asked him about what he put in the cabinet, telling him he would "go get a search warrant for that cabinet, so [he] might as well open it and…show [him] what's in it." Clay BWC Video at 2:08–16; Clay BWC Video Tr., ECF No. 34-6, at 3. Clay said he could "take into account you being honest with me." Clay BWC Video at 2:16–19; Clay BWC Video Tr. at 3. Franklin then said he did not put anything in the cabinet. Stadler BWC Video Tr. at 9; Clay BWC Video Tr. at 3. Clay asked Clodfelter if he could check the cabinet, explaining that he needed Clodfelter's "permission." Clay BWC Video at 2:24–28; Stadler BWC Video Tr. at 9. Clodfelter said "[g]o ahead." Clay BWC Video at 2:28–29; Stadler BWC Video Tr. at 9. Inside the cabinet, the officers found a black Taurus .40 caliber, semi-automatic handgun. Clay BWC Video at 2:40–46; Stadler BWC Video Tr. at 9; Danville Police Report, ECF No. 34, at 2, 6.

After finding the gun, Stadler took hold of Franklin's sweatshirt and slowly moved him up against the wall. Stadler BWC Video at 12:13–27; Clay BWC Video at 3:44–50. Franklin walked over with his hands up and placed them against the wall. Stadler BWC Video at 12:13–27. Nau, acknowledging the increasing tension, said the situation was "turning a little bit different." Id. at 12:22–55; Clay BWC Video at 2:46–28. Clodfelter seemed surprised and dismayed by the gun's discovery. Stadler BWC Video at 12:27–33;

Stadler BWC Video Tr., ECF No. 34-4, at 9–10. Franklin appeared almost frozen with fear, asking Stadler, "please don't hurt me." Stadler BWC Video, ECF No. 34-3, at 12:33–13:13.

The officers questioned Franklin about the gun and his identity. He continued to tell them that his name was "Semaj" and denied owning the gun, claiming he found it "outside." Clay BWC Video, ECF No. 34-5, at 3:13–4:00; Stadler BWC Video Tr. at 10–11. The officers continued interrogating him. Clay BWC Video at 4:04–14; Stadler BWC Video Tr. at 11. The officers soon learned from dispatch that the gun was stolen. Stadler BWC Video at 14:14–21; Stadler BWC Video Tr. at 11. Franklin denied stealing anything and continued to tell them that his name was Semaj. Stadler BWC Video at 14:21–30; Stadler BWC Video Tr. at 11–13. Stadler then put Franklin in handcuffs. Stadler BWC Video at 14:44–49.

The officers, who had seen clear plastic baggies on the table, began asking if drugs were in the apartment, which Clodfelter and Franklin denied. Clay BWC Video at 5:34–55; Stadler BWC Video Tr. at 12. Nau asked Clodfelter if he could look around, and he consented. Stadler BWC Video at 16:26–31. Nau and Clay used flashlights to search the apartment, asking Clodfelter if certain things were his or Franklin's while they rummaged around. Id. at 16:31–17:16; Clay BWC Video at 6:00–7:08.

The officers eventually turned their attention to a black suitcase. Stadler BWC Video Tr. at 22; Danville Police Report, ECF No. 34, at 4, 8. After repeated questioning from the officers and a frustrated Clodfelter, Franklin admitted the suitcase was his. Clay BWC Video at 7:10–8:58; Stadler BWC Video Tr. at 14–17; Danville Police Report at 4, 7–8.[2] Clay, who had already searched the suitcase's top pockets, asked for permission to search the full

---

[2] Franklin later denied the suitcase was his. Clay BWC Video, ECF No. 34-5, at 19:06-09; Clay BWC Video Tr., ECF No. 34-6, at 20.

suitcase, and Franklin apparently consented. Clay BWC Video, ECF No. 34-5, at 8:57–9:04; Stadler BWC Video Tr., ECF No. 34-4, at 17 ("Then you don't mind we check right? Okay cool."). Inside, the officers found a plastic bag containing bindles, some type of seeds, and a powdery substance that looked like heroin. Stadler BWC Video, ECF No. 34-3, at 20:54– 21:43. Subsequent testing confirmed that the substance was heroin. Danville Police Report, ECF No. 34, at 3.

At this point, Clay advised Franklin of his Miranda rights. Stadler BWC Video at 21:43–22:17; Stadler BWC Video Tr. at 20. Franklin said he wanted to talk to an attorney and the officers told him he still needed to tell them his name, which they would eventually discover anyway after fingerprinting him at the jail. Stadler BWC Video at 22:10–34; Stadler BWC Video Tr. at 20–21. Franklin continued to tell the officers that his name was "Semaj" as Clay and Nau searched the apartment. Stadler BWC Video at 22:17–46, 24:14–25:15; Stadler BWC Video Tr. at 20; Clay BWC Video at 12:56–13:24. Franklin admitted some of the bags there were his and gave the officers consent to search them, but they contained only clothing and other personal items. Stadler BWC Video at 22:50–23:15; Stadler BWC Video Tr. at 21; Clay BWC Video at 13:25–16:29.

The officers eventually learned Franklin's real name and took him into custody. On June 18, 2020, Franklin was indicted in the Western District of Virginia for unlawful possession of a firearm by a felon. Indictment, ECF No. 1. He has also been indicted in state court for drug charges. Mem. in Opp., ECF No. 31, at 2, 19–20. Franklin seeks to suppress all physical and testimonial evidence obtained from the encounter. Mot., ECF No. 30.

## II.

"Motions to suppress fall into the class of issues that are decided by the court and not the jury." United States v. Stevenson, 396 F.3d 538, 541 (4th Cir. 2005) (citing Fed. R. Crim. P. 12(b)(3)(C), 12(d); Fed. R. Evid. 104(a)). "In deciding a motion to suppress, the district court is empowered to make findings of fact, and conclusions of law." United States v. Adkinson, 191 F. Supp. 3d 565, 568 (E.D. Va. 2016) (citing Stevenson, 396 F.3d at 541). "As a general rule, the burden of proof is on the defendant who seeks to suppress the evidence. Once the defendant establishes a basis for his suppression motion, the burden shifts to the government." Adkinson, 191 F. Supp. 3d at 568 (internal citations omitted) (citing United States v. Dickerson, 655 F.2d 559, 561 (4th Cir. 1981); United States v. Matlock, 415 U.S. 164, 177–78 n. 14 (1974)).

## III.

Franklin, by counsel, argues that (1) the officers unlawfully seized him, an overnight guest, in Clodfelter's home without the requisite reasonable and particularized suspicion; (2) the officers' search exceeded the scope of any consent given by Clodfelter; and (3) the fruits of this unlawful seizure must be suppressed. See generally Mot., ECF No. 29; Reply, ECF No. 35. Franklin argues that "[t]o dissuade acting on mere hunches that result in police harassment of communities of color, this Court must suppress all testimonial and physical evidence." Mot. at 1–2.

The government disagrees, arguing that "Franklin relies on unsubstantiated allegations of racism and broad-brush arguments about systemic inequities to claim that Clodfelter's clear and obvious consent to enter and search his apartment was coerced or

otherwise improper," but that assertion belies the evidence. Mem. in Opp., ECF No. 31, at 1. In its view, (1) Franklin was not seized until Stadler moved him up against the wall and this was a lawful <u>Terry</u> stop justified by reasonable suspicion, and (2) Franklin does not have standing to contest the consensual search of Clodfelter's apartment and, in particular, his cabinet. <u>See generally</u> <u>id.</u>

### A.

The court will address Franklin's standing first. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. However, Fourth Amendment rights are personal and do not extend to every person present during a search. <u>United States v. Bullard</u>, 645 F.3d 237, 242 (4th Cir. 2011). The mere fact that the government seeks to introduce evidence against a defendant does not, by itself, convey standing to challenge the search that uncovered that evidence. <u>United States v. Gray</u>, 491 F.3d 138, 144 (4th Cir. 2007) ("It is axiomatic that 'suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence.'") (quoting <u>Alderman v. United States</u>, 394 U.S. 165, 171–72 (1969)). Instead, a defendant must show he had a "legitimate expectation of privacy" in the place searched to have standing to suppress the evidence found therein under the Fourth Amendment. <u>United States v. Castellanos</u>, 716 F.3d 828, 846 (4th Cir. 2013), <u>cert. denied</u>, 134 S. Ct. 832 (2013). "To be legitimate, an expectation of privacy must be objectively reasonable: it must flow from 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or

to understandings that are recognized and permitted by society.'" <u>Gray</u>, 491 F.3d at 145 (quoting <u>Minnesota v. Carter</u>, 525 U.S. 83, 89 (1998)).

Society recognizes that a person "may have a legitimate expectation of privacy in the house of someone else." <u>Carter</u>, 525 U.S. at 89. "[A]n overnight guest has a legitimate expectation of privacy in his host's home." <u>Minnesota v. Olson</u>, 495 U.S. 91, 98 (1990). But Fourth Amendment protections do not extend to "anyone legitimately on the premises where a search occurs." <u>Carter</u>, 525 U.S. at 90. For example, "a temporary visitor to a residence—perhaps the mailman or a pizza deliverer—cannot generally claim the Fourth Amendment's protections." <u>Gray</u>, 491 F.3d at 145 (citation omitted).

The government argues that Franklin was merely present in the apartment with Clodfelter's consent and, therefore, has no right to challenge the officers' search. Mem. in Opp., ECF No. 31, at 6–8 (citing, e.g., <u>Gray</u>, 491 F.3d at 144–45). The court understands Franklin to argue that the items found in the house are the fruits of an unlawful seizure of his person within the apartment, presenting no standing issue. Moreover, Franklin argues in his reply, ECF No. 35, that he was an overnight guest in Clodfelter's apartment, which is supported by Clodfelter's statements during and after the arrest, as well as the presence of Franklin's possessions in the apartment, including his suitcase, backpack, and many bags of his clothing. Accordingly, the court finds, by a preponderance of the evidence, that Franklin has standing to contest the officers' search both as an overnight guest and as an individual contesting the discovery of evidence found through an alleged seizure of his person.

**B.**

Franklin contests the lawfulness of the officers' conduct at multiple points, which the court will address in turn. To start, the court finds that the officers lawfully entered the apartment with Clodfelter's consent. "[T]he Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." Illinois v. Rodriguez, 497 U.S. 177, 181 (1990). "The prohibition does not apply, however, to situations in which voluntary consent has been obtained, either from the individual whose property is searched or from a third party who possesses common authority over the premises." Rodriguez, 497 U.S. at 181 (citation omitted). "The question whether consent to search is voluntary—as distinct from being the product of duress or coercion, express or implied—is one 'of fact to be determined from the totality of all the circumstances.'" United States v. Azua-Rinconada, 914 F.3d 319, 324 (4th Cir. 2019) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973)).

Here, the body-worn camera footage shows that Clodfelter willingly—and even casually—accepted the officers into his home to explain what was going on. The Fourth Circuit has repeatedly affirmed that the mere presence of multiple armed officers, "absent any indication of coercive words or acts on their part, is insufficient to raise an inference that [a resident's] consent was an unwitting and unwilling submission to police authority." United States v. Peterson, 524 F.2d 167, 178 (4th Cir. 1975), abrogated on other grounds by Crosby v. United States, 506 U.S. 255 (1993); see also Azua-Rinconada, 914 F.3d at 324–25 (finding consent to enter home was voluntary where officers conversed with homeowner calmly and casually and she invited the officers in, even though one officer said "open the door or we're

going to knock it down"). The evidence shows that no officer threatened or intimidated Clodfelter when he answered the door. No one insisted, yelled, or brandished a weapon. Clodfelter allowed the officers to come into his apartment almost instantly, turning around so that they could follow him in with almost no thought. While Franklin seemed quiet and tense almost immediately, Clodfelter, the apartment's owner, seemed to have no problem inviting the officers into his home, providing them with identification, answering their questions, and conversing with them. The court finds that Clodfelter voluntarily consented to the officers' entry into his home.

## C.

The parties disagree over when Franklin was seized. The court need not decide exactly when Franklin was seized because the officers' pre-arrest actions were supported by either Clodfelter's consent or a reasonable suspicion of criminal activity. "The Supreme Court has identified three distinct types of police-citizen encounters, each requiring a different level of suspicion to be deemed reasonable under the Fourth Amendment: '(1) arrest, which must be supported by probable cause; (2) brief investigatory stops, which must be supported by reasonable articulable suspicion; and (3) brief encounters between police and citizens, which require no objective justification.'" United States v. Brown, 401 F.3d 588, 592 (4th Cir. 2005) (quoting United States v. Weaver, 282 F.3d 302, 309 (4th Cir. 2002)).

An arrest occurs when the "suspect's freedom of action is curtailed to a degree associated with formal arrest." Park v. Shiflett, 250 F.3d 843, 850 (4th Cir. 2001). A seizure does not turn into an arrest merely because the suspect does not feel free to leave. United States v. Elston, 479 F.3d 314, 320 (4th Cir. 2007). Moreover, "a seizure does not occur

simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." Florida v. Bostick, 501 U.S. 429, 434 (1991) (quoting California v. Hodari D., 499 U.S. 621, 628 (1991)). When a seizure occurs, reasonableness is key "in all the circumstances of the particular governmental invasion of a citizen's personal security." Terry v. Ohio, 392 U.S. 1, 19 (1968); accord United States v. Leshuk, 65 F.3d 1105, 1109 (4th Cir. 1995).

Franklin argues he and Clodfelter were seized when the officers, knowing Clodfelter lived in the apartment, would not leave until they confirmed Franklin's identity. Mot., ECF No. 29, at 5–6. To Franklin, this questioning exceeded Clodfelter's consent and amounted to a seizure by show of authority, requiring the men to answer their questions and prove their lawful presence without informing them that they could say no. Id. at 5. In short, Franklin argues he reasonably did not feel free to leave and, therefore, was seized without any reasonable suspicion of criminal activity. See also United States v. Mayo, 361 F.3d 802, 806 (4th Cir. 2004). The government argues that Franklin was not seized in violation of the Fourth Amendment because Clodfelter gave the officers consent to enter the apartment and the encounter remained casual throughout. Mem. in Opp., ECF No. 31, at 9.

The court agrees with the government that Franklin was not seized during the officers' initial questioning. The court has already established that Clodfelter voluntarily allowed the officers into the apartment. For Clodfelter's part, the encounter remained consensual throughout. His conduct was casual until the officers found the gun, he freely gave the officers his driver's license, and he showed no signs of opposing the officers'

continued presence in his apartment while they confirmed Franklin's identity. Franklin and Clodfelter were not seized merely because the officers began to ask questions about a reported break-in once they were inside. See, e.g., Azua-Rinconada, 914 F.3d at 324–25 (affirming denial of suppression motion where officers obtained consent from third person to enter residence and then proceeded to question defendant). It is well-settled that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." Florida v. Bostick, 501 U.S. 429, 434 (1991). "Such 'consensual encounters' demand no inquiry into the reasonableness of the officer's justification for engaging the individual, because the Fourth Amendment is not at all implicated." United States v. Cloud, --- F.3d ---, No. 20-4091, 2021 WL 1342917, at *4 (4th Cir. Apr. 12, 2021).

"It is equally well-settled, however, that 'brief investigatory stops' are 'seizures' that implicate the Fourth Amendment." Id. "A seizure, the Supreme Court recently affirmed, occurs when officers employ physical force or a show of authority that in some way restrain[s] the liberty of the person." Id. (citing Torres v. Madrid, --- U.S. ---, 141 S. Ct. 989, 995 (2021) (internal quotation marks omitted). Meanwhile, a police officer's reasonable suspicion must be "supported by articulable facts that criminal activity 'may be afoot,'" which requires more than "inchoate and unparticularized suspicion or hunch." United States v. Sokolow, 490 U.S. 1, 7 (1989) (citing Terry, 392 U.S. at 30). The court agrees with Franklin that, at some point during the encounter, Franklin reasonably felt he was no longer free to leave, submitted to the officers' authority, and was seized. This court need not decide when exactly Franklin was seized, because the officers' actions throughout were supported

by a reasonable suspicion of criminal activity as required under <u>Terry</u> for a brief investigatory stop.

Even if the court questioned Clodfelter's initial consent and thought Franklin and Clodfelter were seized when the officers entered the apartment to explain why they were there, the officers' actions were supported by a reasonable suspicion of criminal activity. Franklin argues that the neighbor's 9-1-1 call did not provide sufficient information to support a reasonable suspicion, as they merely complained of Black men in sweats carrying trash bags into the apartment next door. But the evidence shows that the 9-1-1 call reported a possible instance of breaking and entering of an apartment which had seemed vacant for months, and the neighbor was afraid because the two men had tried to open her door multiple times. <u>See generally</u> 9-1-1 Audio Recording Tr., ECF No. 34-2. Moreover, the neighbor does not mention the men's race on the 9-1-1 call. If racial prejudice supported her decision to call the police, that prejudice was not passed on to law enforcement in their decision to respond to the call. "The reasonable suspicion standard 'is a commonsensical proposition'" which requires "a particularized and objective basis for suspecting the particular person stopped of criminal activity," but is more flexible than the probable cause standard. <u>Cloud</u>, 2021 WL 1342917, at *8. The 9-1-1 call gave the police officers a reasonable suspicion that two men had broken into Apartment Four.

The officers' actions upon entering the apartment were also reasonable under <u>Terry</u>. They quickly thought the men were lawfully in the apartment but decided to confirm the identities of both men as part of their due diligence. While confirming their identities, Clay began to ask what had been placed in the cabinet. Less than one minute passed from the

time the officers told the two men that they would "get out of their hair" after confirming their identities and the time that Clay began to ask Franklin about what he put in the cabinet. And less than five minutes passed from the time they entered the apartment and their discovery of the gun. Terry, 392 U.S. at 21; see also Elston, 479 F.3d at 319–20 (explaining that "[a] brief but complete restriction of liberty is valid under Terry"). The officers conversed casually with Clodfelter throughout that time, even joking with him. All in all, their efforts to identify both men and their questions in the meantime were not unreasonable. The officers still had more than "inchoate and unparticularized suspicion or hunch" that criminal activity was afoot based on the reported break-in and their unconfirmed identities, and Clay had an additional, particularized suspicion because of the object he saw hidden in the cabinet. Sokolow, 490 U.S. at 7 (citing Terry, 392 U.S. at 30). "Such direct observation of potentially unlawful activity is plainly relevant to a finding of reasonable suspicion." Cloud, 2021 WL 1342917, at *9 (finding reasonable suspicion partially based on officer's observation of passenger hiding what appeared to be a firearm under a car seat). While hiding an object in a cabinet is not, by itself, suspicious activity, the court finds it relevant given the nature of the police call and the fact that Clay observed Franklin hide the object quickly after hearing police at the door.

At the latest, Franklin was seized after the officers discovered the gun and Stadler physically forced him to stand up against the apartment wall with his hands above his head. At that point, the officers reasonably believed that Franklin was being dishonest about his identity and they found a gun that they reasonably believed Franklin hid in the cabinet. The government argues that hidden guns are inherently suspicious and an obvious reason for

hiding one's identity is to avoid responsibility for unlawful conduct, particularly where one's unlawful conduct is linked to their identity such as being a felon in possession of a firearm. Mem. in Opp., ECF No. 31, at 16 (citing, e.g., United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995) ("Hidden guns, even badly hidden guns, are by their nature incriminating.")). Altogether, the court finds that the officers' actions throughout the encounter were supported by Clodfelter's consent and a reasonable suspicion that criminal activity was afoot.

**D.**

Franklin argues that the officers' search of Clodfelter's cabinet was improper, as Clodfelter's consent to search the cabinet was involuntary given the "coercive conditions" in which the officers indicated that they would only leave after identifying the occupants. Mot., ECF No. 29, at 7. According to Franklin, the officers' request to search the cabinet was more akin to an order than a request Clodfelter could accept or decline. The court disagrees and finds that Clodfelter's consent was voluntarily given. As the court has already explained, the encounter was predominantly consensual, though Franklin was seized at some point. Clodfelter, however, remained unencumbered and unruffled throughout. While Stadler tried to confirm Franklin's identity, Clay asked Clodfelter if he could look in the cabinet and told him he needed his permission. At that point, Clodfelter was starting to become frustrated with Franklin but still appeared calm and fairly casual. Clay did not use threats or repeated, coercive questioning to obtain Clodfelter's consent, who was predominantly speaking with Nau and Stadler at the time while sitting towards the opposite end of the room. As such, there is no basis for suppressing the gun, as it was found in a cabinet which the officers had voluntary consent to search.

# IV.

The parties also disagree over when Franklin was arrested. Franklin argues he was arrested when Stadler moved him up against the wall and the officers did not have probable cause to arrest him merely because they found a firearm connected to him in an open-carry state. Mot., ECF No. 29, at 7. The Fourth Amendment requires police officers to have probable cause before arresting an individual without a warrant. Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001) ("the standard of probable cause 'applie[s] to all arrests, without the need to 'balance' the interests and circumstances involved in particular situations.'") (citing Dunaway v. New York, 442 U.S. 200, 208 (1979)). Probable cause exists if the "facts and circumstances within the officer's knowledge...are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Gray, 137 F.3d at 769 (quoting Michigan v. DeFillippo, 443 U.S. 31, 37 (1979)). An arrest occurs when the "suspect's freedom of action is curtailed to a degree associated with formal arrest." Park, 250 F.3d at 850. However, a seizure does not turn into an arrest merely because the suspect does not feel free to leave. Elston, 479 F.3d at 320.

The court finds that Franklin was not arrested until he was placed in handcuffs and his arrest was supported by probable cause. Franklin was temporarily detained after the officers found the hidden gun and forced him up against the wall. During the next two minutes, the officers attempted to identify the gun. They learned it was stolen about two minutes later. Then they placed him in handcuffs. A brief but complete restriction of liberty is valid under Terry. United State v. Moore, 817 F.2d 1105, 1108 (4th Cir. 1993). "Courts

have held that a lawful stop does not necessarily become a custodial arrest when circumstances cause police officers to draw their guns, use force or threats of force, or handcuff suspects." Id. at 1108 (internal citations omitted); see also Leshuk, 65 F.3d at 1109–10. Here, the officers acted reasonably to ensure everyone's safety by temporarily detaining Franklin and moving him away from the gun while they identified it. After learning from dispatch that the gun had been stolen, they placed him in handcuffs for the remainder of the encounter. The court finds that, at that point, Franklin was arrested. Franklin's arrest after learning the hidden gun was stolen was supported by probable cause and provides no basis for suppression. See Elston, 479 F.3d at 316 (affirming denial of suppression motion where police initiated a Terry stop, handcuffed the suspect, and then escalated the detention to an arrest after finding a firearm hidden in the vehicle and learning the suspect had a prior felony conviction).

## V.

Franklin also seeks to suppress the statements he made prior to receiving a Miranda warning as the product of his allegedly unlawful detention. Mot., ECF No. 29, at 8 (citing Miranda v. Arizona, 384 U.S. 436 (1966); Florida v. Royer, 460 U.S. 491, 501 (1983) ("statements given during a period of illegal detention are inadmissible even though voluntarily given if they are the product of the illegal detention and not the result of an independent act of free will"); Wong Sun v. U.S., 371 U.S. 471, 487–88 (1963)).

The Fifth Amendment protects a person from "be[ing] compelled in any criminal case to be a witness against himself."[3] U.S. Const. amend. V. As the court has already explained, Franklin was lawfully seized and, shortly thereafter, arrested. Still, Franklin was entitled to a Miranda warning prior to any custodial interrogation. Leshuk, 65 F.3d at 1108. Many interactions between police and individuals—even individuals suspected of criminal conduct—do not require that police review the Miranda safeguards with suspects, but any statements a suspect makes during custodial interrogation are inadmissible unless the defendant received Miranda warnings. Leshuk, 65 F.3d at 1108; see also United States v. Giddins, 858 F.3d 870, 879 (4th Cir. 2017).

In the first place, questions about Franklin's identity do not qualify as interrogation because they are a part of an officer's "ministerial duty incident to arrest and custody," even after an individual has invoked their right to an attorney. United States v. Taylor, 799 F.2d 126, 128 (4th Cir. 1986); see also I.N.S. v. Lopez-Mendoza, 468 U.S. 1032, 1039 (1984) (a defendant's identity "is never itself suppressible as fruit of an unlawful arrest").

The officers' requests for information about the gun constituted an interrogation. When police engage in "either express questioning or its functional equivalent" an interrogation occurs. Rhode Island v. Innis, 446 U.S. 291, 300–01 (1980). The officers expressly questioned Franklin about the gun after finding it. "Therefore, the issue of whether Miranda applies turns on whether [Franklin] was in custody." Giddins, 858 F.3d at 879.

---

[3] Franklin, by counsel, primarily grounds his argument for suppression of these statements under the Fourth Amendment as the tainted products of his illegal arrest, or "fruits of the poisonous tree." Mot., ECF No. 29, at 8. Given his invocation of Miranda v. Arizona, 384 U.S. 436 (1966), the court construes his motion as raising Fifth Amendment concerns, as well.

A person is "in custody" for <u>Miranda</u> purposes when he is formally arrested or questioned under circumstances in which his freedom of action is curtailed "of the degree associated with a formal arrest." <u>Leshuk</u>, 65 F.3d at 1108 (internal quotation marks omitted). Two inquiries are essential to determining whether a defendant was in custody: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." <u>Thompson v. Keohane</u>, 516 U.S. 99, 112 (1995) (footnote omitted). Among the facts that a court should consider in making a custody determination are: (1) the time, place and purpose of the interaction; (2) the words used by the officer; (3) the officer's tone of voice and general demeanor; (4) the presence of numerous officers; (5) the potential display of a weapon by an officer; and (6) the potential physical contact between the officer and the defendant. <u>United States v. Day</u>, 591 F.3d 679, 696 (4th Cir. 2010). However, "<u>Miranda</u> warnings are not required when a person is questioned during a routine traffic stop or [a <u>Terry</u>] stop." <u>Leshuk</u>, 65 F.3d at 1108 (citations omitted).

The court finds that Franklin was in custody for <u>Miranda</u> purposes when the officers placed him in handcuffs after learning the gun was stolen. The officers did not provide Franklin with <u>Miranda</u> warnings until after discovering the drugs, about seven minutes later. Any unwarned statements that Franklin made about the gun between the time he was placed under arrest and the time he was given <u>Miranda</u> warnings and invoked his right to counsel must be suppressed. But there was no need to advise Franklin of his <u>Miranda</u> rights prior to arrest when the encounter was consensual and then a <u>Terry</u> stop. "Instead of being distinguished by the absence of any restriction of liberty, <u>Terry</u> stops differ from custodial

interrogation in that they must last no longer than necessary to verify or dispel the officer's suspicion. From these standards, we have concluded that drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for Miranda purposes." Leshuk, 65 F.3d at 1109–10 (citations omitted); see also United States v. Hill, 471 F. App'x 143, 154–55 (4th Cir. 2012). Thus, there is no basis for suppressing Franklin's unwarned statements prior to his custodial interrogation, which did not occur until he was handcuffed for the remainder of the encounter. Only then was his liberty curtailed of the degree associated with a formal arrest. Accordingly, the court will not suppress Franklin's pre-arrest statements nor his statements regarding his identity.

## VI.

The government argues this court should not decide whether the drugs found in Franklin's belongings and the statements he made about them are admissible because the government does not intend to introduce them as evidence. Mem. in Opp., ECF No. 31, at 20. The government contends this evidence is irrelevant to its prosecution of Franklin for being a felon in possession of a stolen firearm and the court's ruling would amount to an advisory opinion for the related state prosecution. The court agrees and will deny as moot the question of the admissibility of these items and statements.

## VII.

For these reasons, the court will **DENY IN PART** Franklin's motion to suppress to the gun, all statements about his identity regardless of when they were made, and any statements he made prior to being handcuffed; **GRANT IN PART** the motion as to all

statements Franklin made after he was handcuffed which did not pertain to his identity; and

**DENY AS MOOT** the motion as to any physical or testimonial evidence regarding the

suitcase and the drugs found therein.

An appropriate order will be entered.

It is so **ORDERED**.

Entered:   April 22, 2021

Michael F. Urbanski
Chief U.S. District Judge
2021.04.22 13:49:07 -04'00'

Michael F. Urbanski
Chief United States District Judge